Daniel Cooper (SBN 153576)
daniel@sycamore.law
Jesse C. Swanhuyser (SBN 282186)
jesse@sycamore.law
SYCAMORE LAW, INC.
1004 O'Reilly Avenue, Ste. 100
San Francisco, CA 94129
Tel: (415) 360-2962

Kelly Clark (SBN 312251)
Kelly@lawaterkeeper.org
Benjamin Harris (SBN 313193)
Ben@lawaterkeeper.org
LOS ANGELES WATERKEEPER
120 Broadway, Suite 105
Santa Monica, CA 90401
Tel: (310) 394-6162
Fax: (310) 394-6178

Attorneys for Plaintiff
LOS ANGELES WATERKEEPER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES WATERKEEPER, a public benefit non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>ANGELUS WESTERN PAPER FIBERS, INC., a California corporation,<br><br>Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387 |

# I.    JURISDICTION AND VENUE

1.    This is a civil action brought under the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "Act"), 33 U.S.C. § 1251, *et seq.*

2.    This Court has subject matter jurisdiction over Los Angeles Waterkeeper ("LA Waterkeeper" or "Plaintiff") and Angelus Western Paper Fibers, Inc. ("Angelus" or "Defendant") (collectively the "Parties") and over the subject matter of this action pursuant to section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

3.    This complaint seeks relief for ongoing violations by Angelus of the Clean Water Act, and the terms and conditions of the *National Pollutant Discharge Elimination System Permit No. CA S000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ,* as amended by *Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ,* and *Order No. 2014-0057-DWQ* ("General Permit"), related to polluted storm water and non-storm water discharges from the industrial recycling and document destruction facility owned and operated by Angelus at and near 2474 Porter Street in Los Angeles, California ("Facility").

4.    The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief and civil penalties); 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

5.    Prospective citizen plaintiffs must, as a jurisdictional pre-requisite to enforcing the Clean Water Act in Federal District Court, prepare a Notice of Violation

and Intent to File Suit letter ("Notice Letter") containing, *inter alia*, sufficient information to allow the recipient to identify the standard, limitation or order alleged to be violated, and the activity alleged to constitute a violation. 33 U.S.C. § 1365(a); 40 C.F.R. § 135.3(a).

6.     The Notice Letter must be sent via certified mail at least sixty (60) days prior to filing a complaint ("Notice Period") to the owner of the facility alleged to be in violation of the Act, and where the alleged violator is a corporation, to the corporation's registered agent for service of process. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(a)(1).

7.     A copy of the Notice Letter must be mailed to the Administrator of the U.S. Environmental Protection Agency ("U.S. EPA"), the Regional Administrator of the U.S. EPA for the region in which a violation is alleged to have occurred, and the chief administrative officer for the water pollution control agency for the State in which the violation is alleged to have occurred. 33 U.S.C. § 1365(b); 40 C.F.R. § 135.2(b)(1)(A).

8.     On September 10, 2021, Plaintiff sent a Notice Letter via certified mail to Angelus and its registered agent for service of process. The Notice Letter described ongoing violations of the Act and General Permit at the Facility, and it provided notice of Plaintiff's intention to file suit against Defendant at the expiration of the Notice Period.

9.     The Notice Letter was received by: Angelus and its registered agent for service of process on September 12, 2021; the Los Angeles Regional Water Quality Control Board on September 13, 2021; the State Water Resources Control Board on

1  September 15, 2021; U.S. EPA on September 15, 2021; U.S. EPA Region IX on

2  September 22, 2021; and the U.S. Department of Justice on September 22, 2021.

3       10.    More than sixty (60) days have passed since the Notice Letter was served

4  on Angelus, and the State and Federal agencies.

5       11.    Plaintiff is informed and believes, and thereon alleges, that neither the

6  U.S. EPA nor the State of California has commenced or is diligently prosecuting a

7  court action to redress violations alleged in the Notice Letter and this complaint.

8       12.    Plaintiff's claim for civil penalties is not barred by any prior

9  administrative penalty under section 309(g) of the Act. 33 U.S.C. § 1319(g).

10       13.    Venue is proper in the Central District of California pursuant to section

11  505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is

12  located within this judicial district.

13       LA Waterkeeper, a California public benefit non-profit corporation, by and

14  through its counsel, hereby alleges:

15  **II.**    **<u>INTRODUCTION</u>**

16       14.    This complaint seeks relief for unpermitted and unlawful discharges of

17  pollutants, polluted storm water, and polluted non-storm water from the Facility in

18  violation of the Act and General Permit.

19       15.    Defendant is liable for its past and ongoing failures to comply with the

20  Act, including failures to comply with the discharge prohibitions, technology-based

21  and water quality-based effluent limitations, planning and monitoring requirements,

22  and other procedural and substantive requirements of the General Permit. 33 U.S.C.

23  §§ 1342, 1365.

16. With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, like those conducted by Defendant, flow into Los Angeles' storm drains and contaminate local streams, creeks, rivers, estuaries, harbors, bays, beaches, and coastal waters.

17. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering local creeks and rivers each year. *See e.g.* Bay, S., *Study of the Impact of Stormwater Discharge on Santa Monica Bay*, (Nov. 1999).

18. Numerous scientific studies in recent decades have documented serious health risks to recreational users of southern California's waters from pollutant-loaded storm water and non-storm water discharges. *See, e.g.,* Stenstrom, M. K., *Southern California Environmental Report Card: Stormwater Impact* at 15; Los Angeles County Grand Jury, *Reducing the Risks of Swimming at Los Angeles County Beaches* (1999- 2000) at 205; Haile, R. et al., *An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay* (Santa Monica Bay Restoration Project, 1996) at 5.

19. A landmark epidemiological study showed that people who swam directly in front of storm drain outlets into Santa Monica Bay were far more likely to experience fevers, chills, vomiting, gastroenteritis, and similar health effects than those who swam 100 or 400 yards away from the outlets. Los Angeles County Grand Jury, Reducing the Risks of Swimming at Los Angeles County Beaches (1999-2000) at 205; Haile, R. et al., An Epidemiological Study of Possible Adverse Health Effects of Swimming in Santa Monica Bay at 5.

20.     Los Angeles' waterways are ecologically sensitive areas, and are essential habitat for dozens of cetacean, pinniped, fish, bird, macro-invertebrate and invertebrate species.

21.     Los Angeles' waterways provide numerous recreational activities, including swimming, surfing, SCUBA diving, and kayaking.

22.     Los Angeles' waterways also provide non-contact recreation and aesthetic opportunities, such as hiking, running, biking, and wildlife observation.

23.     Industrial facilities, like Defendant's, that discharge storm water and non-storm water contaminated with sediment, heavy metals, trash, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to toxins, and harm the special social and economic benefits Los Angeles' waterways have for locals and visitors alike.

24.     Controlling polluted storm water and non-storm water discharges associated with industrial activity is essential to protecting southern California's surface and coastal waters and essential to LA Waterkeeper's mission.

## III.   <u>THE PARTIES</u>

25.     LA Waterkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its main office located at 120 Broadway, Suite 105 in Santa Monica, California.

26.     Founded in 1993, LA Waterkeeper is dedicated to the preservation, protection and defense of the inland and coastal surface and ground waters of Los Angeles County. LA Waterkeeper's mission is to fight for the health of the region's waterways, and for sustainable, equitable and climate-friendly water supplies.

27.     The organization works to achieve this goal through education, outreach, advocacy and, where necessary, litigation and enforcement actions under the Clean Water Act on behalf of itself and its members.

28.     LA Waterkeeper's members live, work, and recreate in and around the Los Angeles basin, including many who live and/or recreate along the Los Angeles River, the Los Angeles River Estuary, the Los Angeles/Long Beach Harbor, San Pedro Bay, and the Pacific Ocean (collectively the "Receiving Waters").

29.     LA Waterkeeper members use and enjoy the Receiving Waters to fish, surf, swim, sail, SCUBA dive, kayak, bird/wildlife watch, bike, run, hike, and walk. LA Waterkeeper members also use the Receiving Waters to engage in scientific study through pollution and habitat monitoring, as well as restoration activities.

30.     The Facility's unlawful discharge of pollutants into the Receiving Waters, and failure to comply with the General Permit's non-discharge mandates, harm LA Waterkeeper's members and impair their ability to use and enjoy these waters. The interests of LA Waterkeeper and its members, therefore, have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Act and General Permit.

31.     Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

32.     The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

33.     Angelus filed articles of incorporation with California's Secretary of

1    State on September 9, 1993, under the name Los Angeles Paper Recycling, Inc.

2         34.    The name was amended to Angelus Western Paper Fibers, Inc. in 1994.

3         35.    Angelus is a registered California corporation.

4         36.    The Facility is owned and/or operated by Angelus.

5         37.    The Facility's operations are classified under Standard Industrial

6    Classification ("SIC") code 4953 (Refuse Systems) and 5093 (Scrap and Waste

7    Materials).

8         38.    The Facility's operations include, but are not limited to, receiving, sorting,

9    storing, and processing an average of 350 tons per day of recyclable materials,

10   including cardboard, paper, newsprint, and ferrous material.

11   **IV.   <u>LEGAL BACKGROUND</u>**

12        **A.    The Clean Water Act.**

13        39.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the

14   discharge of any pollutant into waters of the United States unless the discharge

15   complies with other enumerated sections of the Act, including the prohibition on

16   discharges not authorized by, or in violation of, the terms of a National Pollutant

17   Discharge Elimination System ("NPDES") permit issued pursuant to section 402, 33

18   U.S.C. § 1342(b). *See* 40 C.F.R. § 122.26(c)(1).

19        40.    The Act requires all point source discharges of pollutants to waters of the

20   United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. §

21   122.26(c)(1).

22        41.    Any unpermitted discharge of polluted storm water associated with

23   industrial activities is a per se violation of the Act. 33 U.S.C. § 1311(a).

42.    Section 402(p) of the Act establishes a framework regulating industrial storm water discharges under federal and authorized state NPDES permit programs. 33 U.S.C. § 1342(p).

43.    Section 402(b) of the Act allows each state to administer an NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water, approved by the U.S. EPA. 33 U.S.C. § 1342(b).

44.    States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers and/or through individual NPDES permits issued to dischargers. *See id.*

45.    Section 505(a)(1) of the Act provides for citizen enforcement against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1), 1365(f).

46.    A "person" under the Act includes individuals, corporations, partnerships, associations, States, municipalities, commissions, and political subdivisions of a State, or any interstate body. 33 U.S.C. § 1362(5).

47.    "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges; or (b) a condition of an NPDES permit such as the General Permit. 33 U.S.C. § 1365(f).

48.    Each separate violation of the Act subjects the violator to a penalty of up to $52,414 per day per violation for violations occurring after November 2, 2015; and up to $37,500 per day per violation for violations occurring prior to and including

November 2, 2015. 33. U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

49.    Section 505(d) of the Act allows a prevailing or substantially prevailing party to recover litigation costs, including fees for attorneys, experts, and consultants where it finds that such an award is appropriate. 33 U.S.C. § 1365(d).

**B.    California's Storm Water Permit.**

50.    The State Board is charged with regulating pollutants to protect California's water resources.  *See* Cal. Water Code § 13001.

51.    California is authorized by U.S. EPA to issue NPDES permits for storm water discharges associated with industrial activities.

52.    The relevant NPDES permit in this action is the General Permit, which is issued by the State Board, and is implemented and enforced by Regional Board Water Quality Control Boards, including the Los Angeles Regional Water Quality Control Board ("Regional Board"). *See* 33 U.S.C. §§ 1311(a), 1342, 1362(6), 1362(7), 1362(12).

53.    In order to discharge storm water lawfully, certain industrial dischargers in California must obtain coverage under the General Permit and comply with all its terms. 33 U.S.C. § 1311(a); 40 C.F.R. § 122.26(c)(1); *see also* General Permit, § I.A.12.

54.    Compliance with the General Permit constitutes compliance with the Clean Water Act for purposes of storm water discharges.  33. U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E). Conversely, "[General] Permit noncompliance constitutes a violation of the Clean Water Act and the [California] Water Code."

1  General Permit, § XXI.A.

2      55.    Angelus is liable for ongoing violations of the General Permit, and civil

3  penalties and injunctive relief are available remedies. 33 U.S.C. §§ 1311, 1342.

4      56.    The General Permit's annual compliance period runs from July 1 to June

5  30 ("Reporting Year").

6  **C.    The General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

7

8      57.    The General Permit contains the following three sections restricting the

9  discharge of storm water containing pollutants from the Facility: (A) "Discharge

10  Prohibitions;" (B) technology-based effluent limitations (called "Effluent

11  Limitations"); and (C) water quality-based effluent limitations (called "Receiving

12  Water Limitations").

13      58.    The General Permit contains a Discharge Prohibition that prohibits direct

14  and indirect discharges to waters of the United States of non-storm water discharges,

15  liquid materials (e.g. vehicle or building wash water, chemical spills, etc.) other than

16  storm water that are not otherwise authorized by an NPDES permit. General Permit,

17  § III.B.

18      59.    The General Permit contains another Discharge Prohibition that prohibits

19  storm water discharges and authorized non-storm water discharges that contain

20  pollutants that cause or threaten to cause pollution, contamination, or nuisance as

21  defined in section 13050 of California Water Code. General Permit, § III.C.

22      60.    The General Permit also contains technology-based effluent limitations

23  that set the floor for pollution reduction, i.e., they identify the minimum level of

pollution reductions that must be achieved by all permittees regardless of the quality of water receiving storm water discharges.

61.     The General Permit's technology-based effluent limitations require permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. 40 C.F.R. §§ 401.15-401.16 (listing conventional and toxic/non-conventional pollutants); General Permit, § V.A.

62.     Compliance with the BAT standard requires pollutant reductions through the implementation of the best economically achievable technology available in an industry.

63.     Compliance with the General Permit's technology-based effluent limitations requires permittee facilities design and implement effective, site-specific pollution control strategies called Best Management Practices ("BMPs") that prevent or reduce storm water discharges consistent with BAT and/or BCT pollution reduction standards. General Permit, § V.A.

64.     BMPs are schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of waters of the United States. BMPs include treatment systems, operation procedures, and processes to control and abate the discharge of pollutants from the Facility.

65.     Permittees must design BMPs that meet the BCT standard for all sources of conventional pollutants, including Total Suspended Solids ("TSS"), Oil and Grease ("O&G) and pH. 40 C.F.R. § 401.16. Permittees must thereafter implement and

maintain, as well as evaluate and improve, their BMPs so as to ensure the concentration of TSS, O&G, and pH in any storm water discharge is controlled consistent with the BCT standard.

66.     Permittees must design BMPs that meet the BAT standard for all sources of toxic pollutants. Similarly, they must subsequently implement and maintain, as well as evaluate and improve, those BMPs to ensure toxic pollutant concentrations in any storm water discharge are controlled consistent with the BAT standard.

67.     Multiple metals discharged (or potentially discharged) from the Facility here, including lead and zinc, cadmium, and copper are classified as toxic pollutants pursuant section 307(a)(1) of the Act. *See* 40 C.F.R. § 401.15.

68.     The 2008, 2015, and 2021 versions of U.S. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities include numeric standards called benchmarks, which set pollutant concentration limits for industrial storm water discharges ("U.S. EPA Benchmarks"). *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, effective September 29, 2008, effective June 4, 2015, and effective March 1, 2021.

69.     U.S. EPA Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a facility achieve the statutory BAT/BCT standards. *See* 80 Fed. Reg. 34403, 34405 (June 16, 2015); *see also* 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746, 64766-67 (Oct. 30, 2000).

70.     The discharge of storm water containing pollutant concentrations

1 exceeding U.S. EPA Benchmarks evidence a failure to develop and implement

2 pollution control strategies that achieve BAT/BCT-level pollutant reductions. *See*

3 *Santa Monica Baykeeper v. Kramer Metals, Inc.* ("*Kramer*"), 619 F. Supp. 2nd 914,

4 921-25 (C.D. Cal. 2009); *see also* 80 Fed. Reg. 34403, 34405 (June 16, 2015).

5     71.     Table 1 contains U.S. EPA Benchmark standards relevant to the

6 assessing the Facility's compliance with the BAT/BCT standards.

**TABLE 1**
U.S. EPA BENCHMARKS APPLICABLE TO THE FACILITY'S DISCHARGES

| *POLLUTANT* | *2008/2015 BENCHMARK* | *2021 BENCHMARK* |
|---|---|---|
| total suspended solids | 100 mg/L | 100 mg/L |
| aluminum | 0.75 mg/L[*] | 1.1 mg/L |
| iron | 1.0 mg/L | n/a |
| cadmium[**] | 0.0053 mg/L | 0.0018 mg/L |
| copper[**] | 0.0156 mg/L | 0.00519 mg/L |
| lead[**] | 0.095 mg/L | 0.082 mg/L |
| zinc[**] | 0.13 mg/L | 0.12 mg/L |

\* - mg/L = milligrams per liter.
\*\* - Benchmark thresholds for metals are dependent on the hardness of the receiving waters. Numbers in Table 1 are based on a hardness of 100-125 mg/L.

7     72.     Visual observations (and records) required to be maintained pursuant to

8 the General Permit are relevant to assessing a permittee's compliance with the

9 BAT/BCT standards.

10     73.     Objective assessments of whether BMPs described in a SWPPP are

11 consistent with industry best practices are relevant to assessing a permittee's

12 compliance with the BAT/BCT standards.

13     74.     The General Permit contains Numeric Action Levels ("NALs"), which

14 are a set of numeric standards derived from the U.S. EPA Benchmarks, e.g., 0.75

15 mg/L for aluminum.

COMPLAINT                                              14

75.     The exceedance of a NAL, e.g., an average concentration of 1.1 mg/L of aluminum in storm water discharges over a Reporting Year, triggers the requirement that a permittee complete an Exceedance Response Action ("ERA"). ERAs are action plans and/or technical reports that evaluate, and propose revision to, a permittee's pollution prevention measures. Failures to timely complete ERAs are violations of the General Permit.

76.     The General Permit contains water quality-based effluent limitations, called "Receiving Water Limitations," which are intended to protect designated beneficial uses of surface waters to which a facility's storm water is discharged. General Permit, § VI.A.

77.     Beneficial uses of the Receiving Waters are defined in the *Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties*, California Regional Water Quality Control Board, Los Angeles Region 4 (adopted June 13, 1994, as amended) ("Basin Plan").[1]

78.     The Los Angeles River's designated beneficial uses include: Municipal and Domestic Water Supply; Groundwater Recharge; habitat for Rare, Threatened, or Endangered Species; Wildlife Habitat; and Warm Freshwater Habitat. Basin Plan, Table 2-1.

79.     Applicable Receiving Water Limitations vary based on the quality of waters to which a facility discharges and are generally more stringent than the technology-based effluent limitations where a facility's receiving waters are impaired by one or more pollutants. 33 U.S.C. § 1311(b)(1)(C).

---

[1] http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/

80.     Surface waters that cannot support designated beneficial uses (as listed in the Basin Plan) due to the occurrence of high levels of one or more pollutants are designated as impaired water bodies pursuant to section 303(d) of the Clean Water Act. 33 U.S.C. § 1313(d).

81.     According to the 2018 Integrated 303(d) List of Impaired Water Bodies, Reach 2 of the Los Angeles River is impaired for trash, nutrients (algae), ammonia, indicator bacteria, oil, copper, lead.[2]

82.     According to the 2018 Integrated 303(d) List of Impaired Water Bodies, Reach 1 of the Los Angeles River is impaired for trash, pH, cadmium, cyanide, nutrients (algae), ammonia, indicator bacteria, oil, copper (dissolved), lead, and zinc (dissolved).[3]

83.     According to the 2018 Integrated 303(d) List of Impaired Water Bodies, the Los Angeles River Estuary is impaired for chlordane, PCBs (polychlorinated biphenyls) (sediment), trash, DDT (sediment), and toxicity.[4]

84.     According to the 2018 Integrated 303(d) List of Impaired Water Bodies, the San Pedro Bay is impaired for chlordane, total DDT, PCBs, toxicity, and chlordane.[5]

85.     The General Permit's first Receiving Water Limitation prohibits

---

[2] Listed pollutants with applicable Total Daily Maximum Load assessments include trash, nutrients (algae), ammonia, indicator bacteria, copper, and lead.
[3] Listed pollutants with applicable Total Daily Maximum Load assessments include trash, nutrients (algae), ammonia, indicator bacteria, copper (dissolved), lead, zinc (dissolved), pH, and cadmium.
[4] Listed pollutants with applicable Total Daily Maximum Load assessments include chlordane, trash, and DDT (sediment).
[5] Listed pollutants with applicable Total Daily Maximum Load assessments include total DDT, PCBs, toxicity, and chlordane.

1    discharges that cause or contribute to an exceedance of any applicable water quality

2    standard. General Permit, § VI.A.

3        86.    Water quality standards applicable to storm water discharges from the

4    Facility include those set out in the Basin Plan, the Criteria for Priority Toxic

5    Pollutants for the State of California[6] ("California Toxics Rule" or "CTR"), and the

6    Numeric Effluent Limitations ("NELs") incorporated into the General Permit for the

7    Los Angeles River on November 6, 2018 (effective July 1, 2020).

8        87.    The Basin Plan includes numeric and narrative water quality standards

9    for inland surface waters and enclosed bays and estuaries for: pH (6.5 s.u. – 8.5 s.u.),

10   aluminum (0.75 mg/L), chemical constituents, toxic substances, oil & grease,

11   suspended or settleable matter, and floating materials.

12       88.    U.S. EPA promulgated the California Toxics Rule based on a

13   determination that numeric criteria were necessary to protect human health and the

14   environment.

15       89.    Table 2 contains CTR limits relevant to the assessing the Facility's

16   compliance with the General Permit's Receiving Water Limitations.

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23

_____

[6] 65 Fed. Reg. 31712 (May 18, 2000); 40 C.F.R. § 131.38

**TABLE 2**

CTR STANDARDS[7] APPLICABLE TO THE FACILITY'S DISCHARGES

| PARAMETER | SOURCE | NUMERIC LIMIT |
|---|---|---|
| cadmium (dissolved) | California Toxics Rule | 0.0043 mg/L* |
| copper (dissolved) | California Toxics Rule | 0.013 mg/L* |
| lead (dissolved) | California Toxics Rule | 0.065 mg/L* |
| zinc (dissolved) | California Toxics Rule | 0.120 mg/L* |

90. The California Toxics Rule criteria need to be attained at the end of the discharge pipe, unless the State authorizes a mixing zone. 65 Fed. Reg. 31701; *see also* 40 CFR § 131.38(c)(2)(i) (California Toxics Rule "criteria apply throughout the water body including at the point of discharge into the water body."); *see also Kramer*, 619 F.Supp.2d at 926-27.

91. The General Permit was amended in 2018 to incorporate NELs consistent with the Los Angeles River Metals Total Daily Maximum Load wasteload allocations to industrial storm water.

92. Table 3 contains NEL limits relevant to the assessing the Facility's compliance with the General Permit's Receiving Water Limitations.

**TABLE 3**

NUMERIC EFFLUENT LIMITATIONS APPLICABLE TO THE FACILITY'S DISCHARGES

| PARAMETER | SOURCE | NUMERIC LIMIT |
|---|---|---|
| cadmium (total) | General Permit/NEL | 0.0031 mg/L |
| copper (total) | General Permit/NEL | 0.06749 mg/L |
| lead (total) | General Permit/NEL | 0.094 mg/L |

---

[7] Several of the California Toxics Rule limits are hardness dependent. This means that the limit must be adjusted using the methods provided in Appendix J of the 2008 EPA Multi-Sector General Permit to account for Receiving Water sampling hardness, as applicable. Numeric limits with an asterisk (*) are measured in criterion maximum concentrations, which is an estimate of the highest concentration of a material in the water column to which an aquatic community can be exposed briefly without resulting in an unacceptable effect. 40 C.F.R. § 132.2.

| zinc (total) | General Permit/NEL | 0.159 mg/L |
|---|---|---|

93.   The NELs for cadmium, copper, lead, and zinc in the Los Angeles River and tributaries became effective on July 1, 2020.

94.   The exceedance of NEL standards is a violation of the General Permit and the Act.

95.   The General Permit's second Receiving Water Limitation is that pollutant concentrations in storm water discharges shall not adversely impact human health or the environment. General Permit, § VI.B.

96.   Storm water discharges with pollutant concentrations that adversely impact human health or the environment are violations of the General Permit and the Act.

97.   The General Permit's third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. General Permit, § VI.C.

98.   Storm water discharges with pollutant concentrations that threaten to cause pollution or a public nuisance are violations of the General Permit and the Act.

99.   Use of the Receiving Waters by LA Waterkeeper members and the public for water contact recreation and fishing exposes people to toxic metals, pathogens, bacteria and other contaminants in storm water and non-storm water discharges.

100.   Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also harmed by polluted discharges to the Receiving Waters.

/ / /

/ / /

C.      **Trash Waste Load Allocation**

101.    Trash in the Los Angeles River is a major problem affecting all beneficial uses.

102.    The Regional Board adopted a Trash Total Daily Maximum Load for the Los Angeles River Watershed ("LA River Trash TMDL").

103.    The LA River Trash TMDL was subsequently approved by the State Board on February 19, 2002, by the Office of Administrative Law on July 16, 2002, and by the U.S. EPA on August 1, 2002.

104.    The LA River Trash TMDL sets a numeric target of zero (0) trash in the water.

105.    The LA River Trash TMDL assigns wasteload allocations to municipal NPDES permittees and to Caltrans.

106.    The LA River Trash TMDL does not assign a wasteload allocation to industrial dischargers, which is equivalent to assigning a wasteload allocation of zero to General Permit permittees.

107.    The General Permit is the regulatory instrument used to implement the TMDL wasteload allocations assigned to point sources, including the Facility. 40 C.F.R. 122.44(d)(1).

108.    Pursuant to the LA River Trash TMDL, the discharge of any trash from an industrial facility regulated by the General Permit is a violation of the Act and General Permit.

/ / /

/ / /

1

**D.      The General Permit's Pollution Prevention Plan Requirements.**

2      109.   Permittees must develop and implement a Storm Water Pollution

3   Prevention Plan ("SWPPP") at the time industrial activities begin. General Permit, §§

4   I.I.54, X.B.

5      110.   The objectives of the SWPPP are to: i) identify and evaluate sources of

6   pollutants associated with industrial activities that may affect the quality of storm

7   water discharges; and ii) describe and detail site-specific BMPs to reduce or prevent

8   pollutants in storm water discharged from industrial facilities. General Permit, § X.C.

9      111.   The SWPPP must include the following elements, among others: i) a

10  narrative description and summary of all industrial activities, potential sources of

11  pollution, and pollutants associated with each potential source; ii) the identification

12  and location where materials are being shipped, received, stored, and handled, as well

13  as the typical quantities of such materials and the frequency with which they are

14  handled; iii) a description of dust and particulate generating activities; iv) a site map

15  including all areas of industrial activity subject to the General Permit that depicts the

16  storm water conveyance system, associated points of discharge, direction of flow,

17  areas of actual and potential pollutant contact, pollutant control measures, and

18  municipal storm drain inlets that may receive the facility's discharge; v) a description

19  of storm water management practices; vi) a description of the BMPs to be

20  implemented to reduce or prevent pollutants in storm water discharges and authorized

21  non-storm water discharges; vii) the identification of unauthorized non-stormwater

22  discharges and a description of how all such discharges have been eliminated; and

23  viii) a description of persons and their current responsibility for developing and

implementing the SWPPP. General Permit, § X.E-I.

112.   The most important elements of any SWPPP are the description of each industrial process occurring at the facility, and the assessment of potential pollutant sources. General Permit, §§ X.C, X.F, X.G.

113.   Each of the industrial processes and all industrial activities undertaken at the Facility are pollutant sources that must be described and assessed in each SWPPP for their potential contribution of pollutants in storm water discharges.

114.   The SWPPP must be evaluated and revised as necessary, and on at least an annual basis, to ensure ongoing compliance. General Permit, § X.B.

115.   Any failure to develop, implement, or revise a comprehensive SWPPP that contains all required elements is a violation of the General Permit, and creates liability under the Act. General Permit, § X.B; *see also* General Permit, Factsheet § II.I.1.

116.   The General Permit requires permittees to complete an Annual Comprehensive Site Compliance Evaluation ("Compliance Evaluation"). General Permit, § XV.

117.   The Compliance Evaluation must include: a review of all visual observation records, inspection reports, and sampling analysis data; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; an evaluation of each BMP to determine whether it is objectively adequate in light of monitoring and reporting plan data; an assessment of BMP design and implementation effectiveness; a determination of whether additional BMPs are needed to comply with the General Permit; and a visual

1    inspection of equipment needed to implement the SWPPP. General Permit, § XV.

2         **E.      The General Permit's Monitoring and Reporting Requirements.**

3         118.    The General Permit requires that permittees develop a written plan

4    containing the permittee facility's implementation, monitoring and reporting program

5    ("Monitoring Implementation Plan" or "MIP") along with its SWPPP. General Permit,

6    §§ X.I.1-5, XI.

7         119.    The primary objective of the MIP is to ensure compliance with the

8    General Permit's substantive requirements, including the technology-based BAT/BCT

9    standards, and any more stringent water quality-based effluent limitations.

10        120.    The MIP must be designed and implemented to evaluate the effectiveness

11   of BMP design and implementation.

12        121.    Information derived from the MIP informs each permittee as to whether

13   it must adapt BMP design or implementation to ensure that storm water and non-

14   storm water discharges comply with the General Permit. General Permit, §§ X.I, XI.

15        122.    The MIP is an essential component in the General Permit's mandatory

16   iterative self-evaluation process whereby permittees must implement BMPs contained

17   in the SWPPP, evaluate BMP effectiveness using visual observation and storm water

18   sampling data, and then revise BMPs as necessary to consistently comply with the

19   General Permit's technology-based and water quality-based effluent limitations.

20        123.    The MIP must include monthly visual observations of storm water

21   discharges and documentation of pollutants present. General Permit, § XI.A.

22        124.    Permittees are required to take corrective action to reduce or prevent any

23   observed pollutants from coming into contact with storm water and discharging to

1    waters of the United States. General Permit, § XI.A.3.

2        125.   The General Permit requires permittees to collect storm water samples

3    from each location where storm water is discharged from its facility. General Permit,

4    § XI.B.4.

5        126.   The General Permit requires permittees to collect and analyze storm

6    water samples from two Qualifying Storm Events within the first half of each

7    Reporting Year (July 1 to December 31), and two Qualifying Storm Events within the

8    second half of each Reporting Year (January 1 to June 30). General Permit, § XI.B.2.

9        127.   A Qualifying Storm Event is a precipitation event that: (a) produces a

10   discharge from at least one drainage area at the permittee facility; and (b) is preceded

11   by forty-eight (48) hours with no discharge from any drainage area. General Permit,

12   § XI.B.1.

13       128.   Samples must be collected at each discharge point. General Permit,

14   § XI.B.5.

15       129.   The General Permit requires permittees to submit all sampling and

16   analytical results for every sample via the State Board's online NPDES reporting

17   database system—Stormwater Multiple Application and Report Tracking System

18   ("SMARTS")—within thirty (30) days of obtaining each analytical report from a

19   certified laboratory. General Permit, § XI.B.11.a.

20       130.   Permittees must analyze each sample for as many as five sets of

21   pollutants, including: 1) conventional pollutants (pH, TSS, and either total organic

22   carbon or O&G), General Permit, §§ XI.B.6.a-b; 2) facility-specific pollutants

23   identified in the pollutant source description and evaluation process, General Permit,

§ XI.B.6.c; 3) pollutants for which the receiving waters are impaired, General Permit, § XI.B.6.e; 4) Standard Industrial Classification code-based parameters listed in the General Permit at Table 1, which are pollutants common to discharges from particular industrial activities, General Permit, § XI.B.6.d; and 5) Regional Board-mandated parameters, which are any additional pollutants identified by the relevant Regional Board, General Permit, § XI.B.6.f.

131.   The General Permit requires permittees submit an Annual Report to the relevant Regional Board by July 1 of each year, which had to include, *inter alia*, all records collected in the MIP and the Compliance Evaluation.  General Permit, § VI.

132.   Permittees that fail to develop and implement an adequate MIP that includes both visual observations and sampling and analysis are in violation of the General Permit. General Permit, § II.J.3.

133.   The General Permit requires permittees to submit a Compliance Checklist with each Annual Report that contains the following: 1) an indication of whether the permittee complies with, and has addressed all applicable requirements of, the General Permit; 2) an explanation for any noncompliance with requirements within the reporting year, as indicated in the Compliance Checklist; and 3) an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year; and 4) the date(s) of the annual Compliance Evaluation. General Permit, § XVI.

134.   Any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under this General Permit, including reports of compliance or

noncompliance shall upon conviction, be punished by a fine of not more than $10,000 or by imprisonment for not more than two years or by both. General Permit, § XXI.N

## V.   STATEMENT OF FACTS

135.   Angelus is a "person" pursuant to the Act. *See* 33 U.S.C. § 1362(5).

136.   Angelus is the legally responsible operator of the Facility.

137.   The Facility has been enrolled in the General Permit since at least August 4, 1994.

138.   Angelus lists the Facility address as 2474 Porter Street Los Angeles, California 90021 in all permit registration documents it has submitted to the State Board and Regional Board.

139.   According to the SWPPP dated August 14, 2017 ("2017 SWPPP"), the Facility is approximately 1.5 acres.

140.   The Facility is 100% impervious surfaces.

141.   The Facility's operating hours are 5:00am to 8:00pm Monday through Friday, and from 6:00am to 1:00pm on Saturdays.

142.   The Facility is closed on Sundays and certain holidays.

143.   According to the 2017 SWPPP, the Facility provides recycling services, operates a buy-back center, and provides document destruction services.

144.   The Facility receives, sorts, stores, and processes an average of 350 tons per day of recyclable materials, including cardboard, paper, newsprint, and ferrous material.

145.   Angelus operates a shedding machine at the Facility, which is used to process paper and cardboard products.

146.   The Facility's shedder generates dust and particulates.

147.   The Facility is permitted by the City of Los Angeles to process approximately 700 tons per day.

148.  The Facility receives recyclables from the City of Los Angeles' Curbside Collection Program.

149.   The Facility receives mixed municipal recyclable waste.

150.   The City of Los Angeles classifies the Facility as a transfer station and materials recovery facility ("MRF").

151.   All materials are received outdoors at the Facility.

152.   Processed recyclables are stored outdoors until they are shipped out.

153.   Processed recyclables are stored outdoors at areas undisclosed in the 2017 SWPPP.

154.   Each of the industrial processes undertaken by Angelus at the Facility represents a pollutant source that, pursuant to the General Permit, must be disclosed, assessed, and controlled to prevent or limit pollutant concentrations in storm water discharges.

155.   Angelus' NOI dated June 23, 2015 ("2015 NOI") identifies the Facility's Standard Industrial Classification ("SIC") code as 5093 (Scrap and Waste Materials).

156.   Facilities with industrial activity classified as SIC code 5093 are subject to General Permit regulation, i.e., must enroll in and comply with all terms and conditions. General Permit, Attachment A.

157.   Facilities subject to the General Permit must obtain coverage for all areas of a facility at which industrial activity takes place.

158.   Angelus conducts industrial activity at a lot (without an address) situated across Porter Street to the north-east of the main Facility between the 8th Street Amtrak Maintenance Facility and Jio Luggage ("Auxiliary Yard").

159.   Industrial activity at the Auxiliary Yard includes, but is not limited to, industrial material storage, dumpster storage, and vehicle/machinery storage, maintenance, and washing.

160.   None of Angelus' compliance reporting to the Regional Board or State Board indicates that it conducts industrial operations at the Auxiliary Yard.

161.   Angelus has never sought or received coverage under the General Permit for storm water discharges associated with industrial activities occurring at Auxiliary Yard.

162.   Angelus does not have General Permit coverage for industrial activities it conducts at the Auxiliary Yard.

163.   Angelus does not include any reference to or discussion of its industrial activities at the Auxiliary Yard in any of its NOIs, SWPPPs, or MIPs.

164.   Angelus conducts industrial operations on public property, e.g., Porter Street, beyond the boundaries of the Facility and Auxiliary Yard.

165.   Angelus does not include any reference to or discussion of its industrial activities on public property in its NOIs, SWPPPS, or MIPs.

166.   Each discharge of storm water associated with industrial activity from the Auxiliary Yard or from public property on which Angelus conducts industrial activity is an unpermitted discharge to waters of the United States and is a violation of the Act.

167.   Paper, cardboard, and metal materials have been and continue to be washed, tracked, and/or blown throughout the Facility, Auxiliary Yard, and on public property, including Porter Street. As a result, trucks and vehicles leaving the Facility are also pollutant sources by tracking debris, paper, dirt, oil and grease, and other pollutants off site.

168.   Trash and pollutants from the Facility are not adequately controlled and are dispersed for blocks around the Facility.

169.   Defendant's 2017 SWPPP identifies three (3) discharge locations which receive storm water from four surface drains across the Facility.

170.   According to information available to LA Waterkeeper, storm water exposed to industrial activities and pollutants at the Facility is discharged to public streets from, in addition to any discharge locations at the Auxiliary Yard or public property, at least three (3) discharge points

171.   The street outlet on Olympic Boulevard receives storm water from the back of the site.

172.   Storm water from the front of the site drains to a discharge point on the left corner of Porter Street.

173.   Two additional surface drains are located east of the main building, between the roll-cutting and brick storage building, and discharge through the adjacent 15-foot-wide gate to Porter Street.

174.   Defendant's 2017 SWPPP does not identify at discharge locations from the Auxiliary Yard or public property.

175.   Data from the City of Los Angeles shows that storm water discharge

from the Facility and Auxiliary Yard drain into curb opening catch basins on both Olympic Boulevard and Porter Street.

176.    The catch basins merge into a single drain which direct flows to Reach 2 of the Los Angeles River.

177.    Angelus' 2015 NOI identifies the Los Angeles River as the Facility's receiving water.

178.    The 2017 SWPPP identifies Reach 2 of the Los Angeles River as the Facility's receiving water.

179.    Storm water run-off from the Facility is discharged to Reach 2 of the Los Angeles River.

180.    Data from U.S. EPA[8] and the County of Los Angeles[9] confirm that the MS4 inlets that receive the Facility's storm water discharges convey flows to Reach 2 of the Los Angeles River.

181.    Reach 2 of the Los Angeles River conveys storm water discharged from the Facility and Auxiliary Yard to Reach 1 of the Los Angeles River, the Los Angeles River Estuary, Los Angeles/Long Beach Harbor, San Pedro Bay, and coastal waters of the Pacific Ocean in Los Angeles County. As described in paragraph 28, these waters are collectively the Facility's Receiving Waters.

182.    Storm water flowing over the Facility collects suspended sediment, dirt, metals, and other pollutants, which are discharged to the Receiving Waters.

183.    The Receiving Waters are each a water of the United States.

---

[8] See EPA's NPDES Stormwater Discharge Mapping Tool at https://www.epa.gov/npdes/epas-stormwater-discharge-mapping-tools (last visited on July 1, 2020 at 11:53am).
[9] See https://pw.lacounty.gov/fcd/StormDrain/index.cfm.

184.   Angelus' industrial activities result in prohibited discharges of non-storm water, including process waters discharged from Facility's truck/equipment washing, in violation of the General Permit and the Clean Water Act.

185.   BMPs implemented at the Facility have not prevented, and will not prevent, the Facility's pollutant sources from contributing pollutants to storm water discharged to waters of the United States.

186.   Angelus stores industrial materials and conducts industrial activities at the Facility and Auxiliary Yard without adequate BMPs, including, but not limited to, exposure minimization BMPs (e.g. storm resident canopies, storm water containment structures), in violation of the General Permit.

187.   Angelus conducts vehicle and equipment maintenance, fueling, and washing activities outside without adequate BMPs to prevent unauthorized non-storm water discharges and polluted storm water discharges in violation of the General Permit.

188.   The General Permit requires facilities classified under SIC code 5093 to analyze each storm water sample for pH, total suspended solids, oil and grease, iron, lead, aluminum, zinc, and chemical oxygen demand. General Permit, § XI.B.6.d; Table 1.

189.   Angelus has not analyzed any samples collected at the Facility in the last five (5) years for iron, lead, aluminum, zinc, or chemical oxygen demand.

190.   Storm water sampling data collected by LA Waterkeeper on March 10, 2021, establishes that storm water discharged from the Facility contains pollutant concentration in excess of U.S. EPA Benchmarks. Table 4 below summarizes

laboratory analysis of the March 10, 2021, sample compared to the 2008/2015 and 2021 U.S. EPA Benchmarks.

**TABLE 4**

FACILITY EFFLUENT QUALITY COMPARED TO U.S. EPA BENCHMARKS AND NALS

| Parameter | Result (total) | Benchmark 2008/2015 | Benchmark 2021 | NAL |
|---|---|---|---|---|
| TSS | 230 mg/L | 100 mg/L | 100 mg/L | 100 mg/L |
| aluminum | 2.2 mg/L | 0.75 mg/L | 1.1 mg/L | 0.75 mg/L |
| iron | 3.3 mg/L | 1.0 mg/L | n/a | 1.0 mg/L |
| zinc* | 0.77 mg/L | 0.13 mg/L | 0.12 mg/L | 0.26 mg/L |

\* - Benchmark thresholds for metals are dependent on the hardness of the receiving waters. Numbers in Table 2 are based on a hardness of 100-125 mg/L.

191.    Exceedances of U.S. EPA Benchmarks evidence a failure to develop, implement, and/or maintain BMPs for the Facility that achieve BAT/BCT-level pollutant concentrations.

192.    Pollutant concentrations in Table 4 also exceed the General Permit's NALs and would trigger the requirement that Angelus complete an ERA action.

193.    The failure to develop, implement, and/or maintain BMPs at the Facility that achieve BAT/BCT-level pollutant concentrations is a violation of the General Permit's technology-based effluent limitations and the Act.

194.    Storm water sampling data collected by LA Waterkeeper on March 10, 2021, establishes that storm water discharged from the Facility contains pollutant concentration in excess of California Toxics Rule limits. Table 3 below summarizes laboratory analysis of the March 10, 2021 sample as compared to California Toxics Rule limits.

/ / /

/ / /

COMPLAINT                                                                32

**TABLE 5**

| Parameter | Result (dissolved) | CTR |
|---|---|---|
| zinc | 0.37 mg/L | 0.12 mg/L |

195.   Exceeding any CTR limit establishes that Angelus's storm water discharges cause or contribute to an exceedance of an applicable water quality standard and violates the General Permit's water quality-based effluent limitations.

196.   Storm water sampling data collected by LA Waterkeeper on March 10, 2021, establishes that storm water discharged from the Facility contains zinc at a concentration exceeding the appliable NEL value. Table 4 below summarizes laboratory analysis of the March 10, 2021 sample as compared to applicable the NEL value.

**TABLE 6**

| Parameter | Result (total) | NEL |
|---|---|---|
| zinc | 0.77 mg/L | 0.159 mg/L |

197.   The exceedance of any NEL establishes a violation of the Act and the General Permit's water quality-based effluent limitations.

198.   Significant quantities of trash are blown and washed onto public streets in the area surrounding the Facility and Auxiliary Yard. This trash ultimately is discharged into the Receiving Waters.

199.   Each discharge of trash from the Facility, Auxiliary Yard, and/or related industrial activities conducted on public property is a violation of the General Permit.

200.   Angelus has and continues to conduct industrial activities at the Facility, as well as related industrial activities at the Auxiliary Yard and on public property, without a developing, implementing, or revising a lawful SWPPP.

201.   Among other SWPPP violations, Angelus' SWPPPs do not include a

compliant site map, pollutant source description or assessment, adequate BMPs or descriptions of BMPs.

202.   The discharge of storm water from the Facility containing pollutant concentrations exceeding U.S. EPA Benchmarks, CTR limits, and NELs evidence a failure to develop, implement, and revise a lawful SWPPP.

203.   Angelus has conducted and continues to conduct industrial activities at the Facility, as well as related industrial activities at the Auxiliary Yard and on public property, without a developing, implementing, or revising a compliant MIP.

204.   Among other MIP violations, Angelus has failed to complete and record visual observations of all areas of industrial activity, failed to conduct required sampling/ analysis of Qualifying Storm Events, and failed to analyze samples collected for all required pollutants.

205.   Angelus has violated and continues to violate the Act and General Permit for failing to obtain coverage for all areas of industrial activity, including the Auxiliary Yard and on public property.

## VI.       <u>CLAIMS FOR RELIEF</u>

### <u>FIRST CAUSE OF ACTION</u>

**Defendant's Discharges of Contaminated Storm Water in
Violation of the General Permit's Receiving Water Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

206.   LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

207.   Since at least September 10, 2016, Defendant has discharged contaminated storm water from the Facility containing levels of pollutants that cause

or contribute to exceedances of applicable water quality standards; adversely impact human health and the environment; and threaten to cause pollution or a public nuisance in violation of the General Permit's Receiving Water Limitations.

208.   LA Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that cause or contribute to exceedances of applicable water quality standards, adversely impact human health and/or the environment, and threaten to cause pollution or a public nuisance from the Facility, occur each time storm water was/is discharges from the Facility.

209.   Defendant's violations of the General Permit's Receiving Water Limitations are ongoing and continuous.

210.   Each and every violation of any of the General Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

211.   Every day, since at least September 10, 2016, that Defendant has discharged polluted storm water from the Facility in violation of the General Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

212.   Angelus is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from September 10, 2016, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

213.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

214.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

**Defendant's Discharges of Contaminated Storm Water in
Violation of the General Permit's Numeric Effluent Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

215.   LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

216.   LA Waterkeeper is informed and believes, and thereon alleges, that Defendant has discharged storm water containing pollutant concentrations exceeding the General Permit's NEL standards on each occasion that storm water has been discharged from the Facility since July 1, 2020.

217.   Defendant's violations of the General Permit's NELs are ongoing and continuous.

218.   Every day since July 1, 2020, that Defendant has discharged polluted storm water from the Facility containing pollutants in concentrations exceeding any NEL is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

219.   Each and every violation of any General Permit's NEL standard is a

separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

220.   Angelus is subject to an assessment of civil penalties for each and every violation of a General Permit's NEL standard occurring between July 1, 2020, and the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

221.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

222.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

## THIRD CAUSE OF ACTION

### Defendant's Discharges of Contaminated Storm Water in Violation of the General Permit's Effluent Limitations and the Act (33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))

223.   LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

224.   Angelus has failed, and continues to fail, to reduce or prevent pollutants associated with industrial activities from being discharged to waters of the United States through the implementation of BMPs at the Facility that achieve the technology-based BAT/BCT treatment standards.

225.   Angelus discharges storm water from the Facility, as well as from the Auxiliary Yard and public property, containing concentrations of pollutants exceeding the BAT/BCT level of control during every significant rain event.

226.   Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit's Effluent Limitations and the Act. *See* General Permit, §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

227.   Defendant violates and will continue to violate the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control are discharged from the Facility.

228.   Each and every violation of the General Permit's technology-based effluent limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

229.   Defendant's violations of the General Permit's technology-based effluent limitations and the Act are ongoing and continuous.

230.    Angelus is subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from September 10, 2016, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

231.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California,

for which there is no plain, speedy, or adequate remedy at law.

232.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendant as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendant's Discharges from the Auxiliary Yard and Public Property Without General Permit Coverage Constitute Unpermitted Discharges and are Violations of Section 301(a) of the Act (33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

233.   LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

234.   Angelus has failed, and continues to fail, to obtain General Permit coverage for all areas of industrial activity, including specifically the Auxiliary Yard and public property, e.g., Porter Street.

235.   Each and every discharge of polluted storm water and/or unauthorized non-storm water from anywhere not described in Angelus' permit registration documents, e.g., NOIs, SWPPPs and MIPs, without General Permit coverage is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

236.   Defendant's violations of section 301(a)'s discharge prohibition are ongoing and continuous.

237.   Angelus is subject to an assessment of civil penalties for each and every violation of the Act occurring from September 10, 2016, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

238. An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

239. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendant as set forth hereafter.

## **FIFTH CAUSE OF ACTION**

**Defendant's Failure to Prepare, Implement, Review, and Update
A Compliant Storm Water Pollution Prevention Plan
(Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

240. LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

241. Defendant has not developed and implemented a legally adequate SWPPP for the Facility.

242. Defendant's violations of the General Permit's SWPPP requirements are ongoing and continuous.

243. Each day since September 10, 2016, that Defendant has not developed, implemented, and reviewed and updated a legally adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

244. Defendant has been in violation of the General Permit's SWPPP

40

requirements every day since September 10, 2016.  Violations continue each day that an adequate SWPPP for the Facility is not developed and fully implemented.

245.   Angelus is subject to an assessment of civil penalties for each and every violation of the Act occurring from September 10, 2016, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

246.   An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

247.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

## SIXTH CAUSE OF ACTION

### Defendant's Failure to Develop and Implement
### a Compliant Monitoring Implementation Plan
### (Violations of General Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

248.   LA Waterkeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

249.   Defendant has not developed and implemented a legally adequate monitoring and reporting program, or MIP, for the Facility.

250.    Defendant's violations of the General Permit's MIP mandate are ongoing and continuous.

251.   Each day since September 10, 2016, that Defendant has not developed and implemented a lawful MIP for the Facility and all related areas of industrial activity in violation of the General Permit is a separate and distinct violation of the General Permit and section 301(a) of the Act. 33 U.S.C. § 1311(a).

252.   Angelus is subject to an assessment of civil penalties for each and every violation of the Act occurring from September 10, 2016, to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

253.   An action for injunctive relief is authorized by Act section 505(a). 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm LA Waterkeeper and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

254.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, LA Waterkeeper prays for judgment against Defendants as set forth hereafter.

## **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated, and to be in violation of, the General Permit and Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water and unauthorized non-storm water from the Facility, the Auxiliary Yard, and public

property except as authorized by the General Permit;

        c.  Enjoin Defendant from further violating the procedural requirements of the General Permit;

        d.  Order Defendant to immediately implement storm water pollution control technologies and measures that satisfy BAT and BCT and that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

        e.  Order Defendant to obtain General Permit coverage for all areas of industrial activity;

        f.  Order Defendant to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

        g.  Order Defendant to prepare a SWPPP consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

        h.  Order Defendant to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

        i.  Order Defendant to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since August 23, 2014, up to and including November 2, 2015, and up to $52,414 for violations occurring after November 2, 2015 pursuant to sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1 - 19.4;

1          j.   Order Defendant to take appropriate actions to restore the quality of

2    waters impaired or adversely affected by its activities;

3          k.   Award Plaintiff's costs (including reasonable investigative, attorney,

4    witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

5    § 1365(d); and,

6          l.   Award any such other and further relief deemed appropriate by the

7    Court.

8

9    DATED: December 7, 2021          Respectfully submitted,

10
                              By:   /s/ Jesse C. Swanhuyser
11                                  Jesse C. Swanhuyser
                                    Sycamore Law, Inc.
12                                  Attorney for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23